**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOUREY NEWELL**, individually and on behalf of all others similarly situated, | Case No. |
| *Plaintiff,* | 2:25-cv-01419-GAM |
| *v.* | |
| **JR CAPITAL, LLC** | |
| *Defendant.* | |

**PLAINTIFF'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
Introduction**

JR Capital's motion turns on a single premise, that the cellular telephone number Jourey Newell[1] has carried since well before November 2022, and which has sat on the National Do Not Call Registry the entire time, is a "business number" outside the TCPA's protection. The record does not support that premise, and it does not come close to supporting the equitable estoppel defense JR Capital raises in the alternative.

A wireless number registered on the National Do Not Call Registry is presumptively residential. JR Capital's own discovery record, an individual consumer cellular plan, held in Newell's own name, billed to his home, confirms that presumption. JR Capital's entire contrary theory rests on two government database entries, neither of which reflects a representation by Newell that the number is his business's line, and neither of which JR Capital even looked at before blasting Mr. Newell with the text message calls. In any event, both those forms ask

---

[1] That Mr. Newell's name might be familiar to the Court arising out of his other consumer protection litigation in this District and elsewhere does not change the fact that this Court must consider both the legal principles and evidence before it, not Defendant's self-serving characterizations of Mr. Newell's consumer advocacy and vigorous enforcement of his statutory rights under the TCPA. *See Pro Source, infra*, 2025 WL 817485, at *4-*6.

separately for a "business" telephone number and a "personal" or "cell phone" contact number, and the undisputed testimony is that Newell answered those questions correctly, putting his actual business number, a separate line he has held since 2018 and which is not at issue here, in the business fields, and the number at issue here in the personal contact fields. Public search tools that do not distinguish between those fields when they display results are not evidence that Newell held himself out as anything.

Discovery has made the mismatch between JR Capital's theory and JR Capital's own evidence even more palpable. JR Capital's corporate designee admitted that the company obtained the 4132 number at issue in 2022 through a bulk purchase of a Dun & Bradstreet marketing database. (Ex. 1, Robbins Dep., at 21:13-16.) But that purchased record lists Newell's personal name, "Newell, Jourey," as the "Company Name," lists a residential address, and labels its telephone fields "Direct Phone" and "Phone 2". (Ex. 5, Defendant's Discovery Responses, Rog. Resp. No. 8.) Nowhere in the data that Defendant purchased does it describe Mr. Newell's number as a business line. Asked where the record says the number is a business number, the designee could offer only a tautology: "Well, all records from Dun and Bradstreet are businesses." (Ex. 1 at 29:19-22.) JR Capital never consulted either government registry its motion now features, nor could it, because both registrations belong to Newell Contracting LLC, an entity that did not exist until nearly a year *after* JR Capital purchased the data and sent its first call. And when Newell told JR Capital directly, in an August 2023 email, that the number was his personal cell phone and demanded that the messages stop, JR Capital claims it "missed" the email through "human error," because JR Capital "get[s] a lot of emails," and continued to call the number for another year and a half. (Ex. 6, Email to JR Capital; Ex. 1 at 32:13-33:8.)

Two independent grounds require denial of JR Capital's motion. First, as explained in Section A below, the Caller ID transmission requirement applies to *all* telemarketing calls, *regardless of* whether the called number is residential or a business line, which is reason enough to deny summary judgment on Count II without regard to how the Court resolves the residential/business dispute. Second, and independently, JR Capital has not carried its burden on that residential/business dispute, which underlies all three of Newell's counts, nor on the equitable estoppel defense it raises as a fallback.

For the reasons set forth below, JR Capital's motion should be denied in its entirety.

**Facts**

Jourey Newell is the subscriber and named account holder of a wireless telephone number ending in 4132. The number is assigned to an individual consumer cellular telephone service plan, held in Newell's own personal name, not in the name of any business, and billed to his residential address in King of Prussia, Pennsylvania. (Newell Dec. ¶ 2.) The number has been registered on the National Do Not Call Registry since before the messages at issue. (*Id.* ¶ 3.) Newell separately maintains a dedicated business telephone number, ending in 1170, which he acquired in October 2018 and which is the telephone number for Newell Contracting LLC. (Ex. 4, Newell Dep., at 18:4-7; 19:6-11.) Since October 2018, the 1170 number has been the number that would be put out as the business number, the number Newell gives out "to people to ask, like, if they wanted work done." (Ex. 4 at 20:2-7.)

Newell's business began as Newell Landscaping, a part-time, one-man landscaping sole proprietorship in operation since roughly 2016. In October 2023, Newell formed Newell Contracting LLC, which continues the same owner-operated work with some additional handyman services. (Ex. 4 at 19:14-16; 34:1-19; 36:17-37:9.) Before Newell acquired the 1170

number in October 2018, he received landscaping-related calls on the 4132 number. From October 2018 forward, the 1170 number has been the business's outward-facing number, and business-related contact on the 4132 number has been merely incidental, such as a long-time customer who has not updated his contacts, or a family member passing the personal number to someone who needs work done. (Ex. 4 at 18:4-7; 19:6-11; 20:2-7; 54:16-55:23.)

Between November 4, 2022 and February 2025, JR Capital sent five text message calls to the 4132 number, each advertising financing for trucks and other business equipment. JR Capital did not obtain the number from Newell, and it did not obtain the number from either of the public listings its motion now features. By its own sworn account, JR Capital received the number in 2022 from a commercial Dun & Bradstreet marketing database, through a subscription in which it "purchased full access to all businesses throughout America." (*See generally* Ex. 1 at 14:5-12; 20:2-5; 21:13-16; 46:11-13; 47:13-16; 52:16-22.) The record JR Capital exported from that database identifies the "Company Name" as "Newell, Jourey," Newell's own personal name, and the address as a residence on the 400 block of Brandywine Lane. (Ex. 5, Resp. No. 8.) Its two telephone fields are labeled "Direct Phone" and "Phone 2." *Id.* The record nowhere describes the 4132 number as a "business" number.

JR Capital's corporate designee, Paris Robbins, could not fill the gaps in that purchased record. He does not know where Dun & Bradstreet obtained the 4132 number. (Ex. 1 at 23:2-5.) JR Capital ran no line type identification to determine whether the number was even a wireless number. (Ex. 1 at 37:12-24.) JR Capital has no practice of checking whether a number obtained from Dun & Bradstreet is a business or residential number, and when asked how the 4132 number was "confirmed" to be a business number, Robbins answered that "it was confirmed

through the fact that we bought a database from Dun and Bradstreet, which are all businesses." (Ex. 1 at 21:17-23; 22:9-14.)

The two public listings on which JR Capital's motion rests *did not even exist* when JR Capital acquired the 4132 number and began calling it. Both are registrations of Newell Contracting LLC, an entity formed in October 2023, a year *after* JR Capital purchased the Dun & Bradstreet data *and eleven months after JR Capital sent the first call* on November 4, 2022. (Ex. 4 at 34:1-3; 46:16-23; 96:20-97:17.) Apart from not relying on them, however, JR Capital also fails to credit that the forms both ask for personal telephone numbers, which Mr. Newell provided. (Ex. 2, PA Form; Ex. 3, FMCSA Form). Newell testified that he filled them in accordingly, on the Pennsylvania Attorney General's Home Improvement Contractor Registration, he would have put Business Phone Number as 1170 and his Personal Telephone Number as 4132, and on the FMCSA's motor carrier registration, he entered the 4132 number not as the business number, but instead as his personal cell phone, in accordance with the application's prompt for a cell phone number. (Ex. 4 at 45:1-12; 49:9-12; 55:22-23.) Neither registry's public search function distinguishes between the business and personal fields when it displays results. The Attorney General's registry simply shows whatever appears in the "Personal Telephone Number" field next to the company's name. And Mr. Newell corrected the FMCSA listing to the 1170 number as soon as he "became aware of the phone number that was being displayed." (Ex. 4 at 110:3-6.)

Finally, the only communication that ever passed between these parties before this lawsuit was Newell telling JR Capital, in writing, that the 4132 number was his personal cell phone and that he did not want to get calls. JR Capital continued sending its calls anyway, having full knowledge both of the nature of Plaintiff's number and also that he did not want to

receive calls. On August 7, 2023, with at least three of the five text message calls still to come, Newell emailed JR Capital from his personal Gmail account, under his own name, requesting "a copy of your company's Do-Not-Call Policy" and demanding that JR Capital "cease and desist all telemarketing calls to *my* mobile telephone," a "cellular telephone number" for which he had never "provided [his] consent." (Ex. 6 (emphasis added).) Robbins conceded that Newell's email to JR was recorded in writing not to call him, and that the email nowhere describes the number as a business line: "Q. He says it's a cell phone number. Right? A. That's what he says, yeah." (Ex. 1 at 32:6-12; 36:20-37:1.) JR Capital nonetheless kept calling the number into February 2025, because, as Robbins admitted, "human error" caused JR Capital to "miss[]" the email, because, in Robbins' telling, JR Capital gets too many emailed complaints about its marketing, and despite having noted Mr. Newell's email in its CRM system. (Ex. 1 at 32:1-33:8; 37:7-9.)

JR Capital's response to that email was not to stop. Mr. Newell continued to receive text message calls from JR Capital at the 4132 number after he sent that email. Whatever excuse JR Capital offers for this failure, an excuse rendered all the more implausible because it nevertheless notated Mr. Newell's number in its CRM system, nothing excuses what came after. JR Capital continued sending at least three calls to the 4132 number for roughly another eighteen months, into February 2025, after Newell had told it in writing, in his own name, that the number was his personal cell phone, not a business phone, that he had never consented to be called, and that he wanted the calls to stop. A company that receives an unambiguous, written cease and desist and simply keeps calling with text message calls is a company that did not care what the truth was.

### Standard

The standard for a motion for summary judgment is well established before this Court. Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears

the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.

v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets that burden, the nonmovant

must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 250 (1986). All inferences are drawn in the nonmovant's favor. *Id.* at

255. The party seeking summary judgment also bears the burden of establishing that the

undisputed facts entitle it to judgment as a matter of law. *In re Asbestos Prods. Liab. Litig. (No.

VI)*, 822 F.3d 125, 135 (3d Cir. 2016).

**Argument**

**A.      Summary Judgment Must Be Denied on the Caller ID Claim (Count II) Because
          Section 64.1601(e) Governs All Telemarketing, and the Character of the 4132
          Number Is Irrelevant to That Claim.**

JR Capital's motion rests, from its first page to its last, on a single factual premise, that

the 4132 number is a business line rather than a residential one. Newell disputes that premise.

*See infra* Sections B-C. But as to Count II, the Court need not resolve the dispute, because the

premise is beside the point. The caller ID regulation imposes its duty on "[a]ny person or entity

that engages in telemarketing," regardless of who is called. 47 C.F.R. § 64.1601(e). It conditions

neither the duty nor the underlying violation on the residential or business character of the line

the telemarketer dials. JR Capital concedes, as it must, that the regulation contains no residential

limitation. Def. Mem., ECF No. 33 at 13 (acknowledging that § 64.1601(e) "does not expressly

reference residential numbers," and conceding the point: "True enough."). Its request that the

Court insert one anyway is the same interpretive maneuver this Court rejected at the pleading

stage, when JR Capital tried to import subsection (a)'s PSTN limitations into subsection (e).

*Newell v. JR Cap., LLC*, 791 F. Supp. 3d 571, 583 (E.D. Pa. 2025).

Text, structure, context, and administrative history all refute the maneuver again. Count II does not require a residential number, so the motion fails as to Count II, regardless of how the Court resolves the residential dispute

### 1.    The FCC Says "Residential" When It Means Residential. It Did Not Say It in § 64.1601(e).

The analysis begins where this Court's prior opinion in this case began: with the text, read with all the "traditional tools of construction." *Kisor v. Wilkie*, 588 U.S. 558, 559 (2019). Section 64.1601(e) provides that "[a]ny person or entity that engages in telemarketing . . . must transmit caller identification information." Every operative term in the regulation is universal. The regulated party is "[a]ny person or entity." The triggering conduct, "telemarketing," is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to *any person*." 47 C.F.R. § 64.1200(f)(13) (emphasis added). And the callback number the telemarketer transmits "must permit *any individual* to make a do-not-call request during regular business hours." 47 C.F.R. § 64.1601(e)(1) (emphasis added). *Any* person or entity. *Any* person. *Any* individual. The word "residential" appears nowhere in § 64.1601(e) or the other regulations it incorporates by reference, including that of "telemarketing."

That omission speaks volumes, because the FCC plainly knows how to write a residential limitation when it intends one. The do not call rules underlying Counts I and III are expressly and repeatedly confined to residential subscribers:

- Section 64.1200(c)(1) forbids "any telephone solicitation" to "[a]ny *residential telephone subscriber*" before 8 a.m. or after 9 p.m.;

- Section 64.1200(c)(2), the source of Count I, forbids solicitations to "[a] *residential telephone subscriber*" who has registered on the national do-not-call registry;

- Section 64.1200(d), the source of Count III, forbids telemarketing calls "to a *residential telephone subscriber*" absent internal do-not-call procedures; and

- Section 64.1200(e) extends the rules in paragraphs (c) and (d) to "wireless telephone numbers," which begs the question of why the parties are even litigating the residential character of the 4132 number on Counts I and III at all, given the presumption that cellular numbers are residential.

Section 64.1601(e) stands in deliberate contrast. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up). As this Court has already held in this case, the ordinary rules of statutory construction "also apply when interpreting agency regulations." *Newell*, 791 F. Supp. 3d at 576 n.5. The presumption of intentional drafting applies with singular force here. The same agency wrote "residential telephone subscriber" throughout § 64.1200(c) through (e) and omitted it from § 64.1601(e). That was a choice, and it was no accident. The Commission announced the choice in terms: "The new rules will also require *all companies conducting telemarketing* to transmit caller identification (caller ID) information." 2003 TCPA Order (emphasis added). "All" does not mean "all who happen to be sending text message calls to residential lines."

Grafting an unwritten residential element onto § 64.1601(e) would also flout the anti-rewriting principle this Court invoked the last time JR Capital attempted precisely this move. When JR Capital argued that subsection (a)'s carrier limitations silently carried over into subsection (e), the Court held that reading extratextual limitations into (e) "would violate" the "basic tenet" that a regulation "should be construed so that effect is given to all its provisions." *Id.* at 583 n.15. JR Capital's new proposed limitation fares no better than its last one. The regulation means what it says: *any* person or entity that engages in telemarketing must transmit compliant caller identification, on every telemarketing call and text call, to every recipient.

9

2.    **Section 227(c) Does Not Silently Confine § 64.1601(e) to Residential Numbers.**

Anticipating the text, JR Capital retreats to the statute. Because § 227(c)(1) directed a rulemaking "concerning the need to protect *residential telephone subscribers'* privacy rights," the argument goes, any regulation promulgated under § 227(c) can reach only residential lines, and a broader reading would exceed the FCC's delegated authority. Def. Mem., ECF No. 33 at 13. The argument confuses the *purpose* of a delegation with the *scope* of the rules it authorizes.

*First*, the operative texts, regulation and statute alike, are written in universal terms. The duty attaches to "[a]ny person or entity that engages in telemarketing," 47 C.F.R. § 64.1601(e), and "telemarketing" is by definition a call or message "transmitted to *any person*," 47 C.F.R. § 64.1200(f)(13). And that very definition comes from Congress, not the FCC. Section 227(c)(1) itself frames the protected interest as freedom from unwanted "telephone solicitations," and Congress defined "telephone solicitation," in the TCPA's own definitions section, identically, as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to *any person*." 47 U.S.C. § 227(a)(4) (emphasis added). In other words, the very vocabulary Congress supplied for the § 227(c) rulemaking in prohibiting "telephone solicitations," the words that define when telemarketing duties attach, is not confined to residential recipients but to "any person."

Where a § 227(c) rule is limited to residential lines by Congress, such as with respect to the do-not-call registry rules in 47 U.S.C. § 227(c)(3), the FCC writes "residential telephone subscriber" into the regulation expressly, § 64.1200(c)-(d). Where the rule imposes a duty on every telemarketing transmission, as § 64.1601(e) does, no such words appear. If § 227(c)(1)'s purpose clause silently confined every implementing regulation to residential lines, the

Commission's careful, repeated deployment of "residential" in some § 227(c) rules, and its omission from this one, would be inexplicable surplusage.

*Second*, Congress articulated the goals but delegated the means, and a universal caller ID duty is the means. Section 227(c)(1) ordered the FCC to "compare and evaluate alternative methods and procedures," including "the use of . . . telephone network technologies," and then, in § 227(c)(2), to "develop proposed regulations to implement the methods and procedures that the Commission determines are *most effective and efficient* to accomplish the purposes of this section." 47 U.S.C. §§ 227(c)(1)(A), (c)(2) (emphasis added). Nowhere in that language did Congress indicate that it intended to restrict that to residential subscribers.

A caller ID mandate is "effective and efficient" only if it is universal. Caller identification is transmitted at the instant a call or text call is initiated and equally to residences and businesses. A caller ID rule that operates only when there is a residential/business inquiry, and when that inquiry ultimately resolves in favor of "residential" status would be no method at all, for residential subscribers would receive anonymous calls and text calls whenever the caller guessed, or later litigated, the line's status. The Commission chose the only design that works. Everyone who telemarkets must identify himself, on every call.

That the universal rule also benefits business recipients of calls is neither strange nor untoward, it is how written law ordinarily works. A statute or regulation adopted with a principal class of beneficiaries in mind routinely confers its protections more broadly, because "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). Congress announces purposes in its delegations and agencies recite objectives in their preambles, but "[o]nly the written word is the law, and all persons are entitled to its benefit." *Bostock v.*

*Clayton Cnty.*, 590 U.S. 644, 653 (2020). The TCPA is not the only example of network effects present in the United States Code. Securities regulations written to protect ordinary investors shield sophisticated funds, food safety rules written with consumers in mind protect prisoners and corporate luncheons, and a caller ID rule written with the goal of securing residential privacy identifies the telemarketer to every recipient of its calls, regardless of whether they are residential subscribers or not. The purpose stated in § 227(c)(1) explains *why* the rule exists, not to whom it is restricted, as in § 227(c)(3), which limits the do-not-call list to "a list *of* residential subscribers." The purpose in § 227(c)(1), by contrast, does not shrink what the rule *says*. And whatever the drafters may have pictured as the paradigm case, "the limits of the drafters' imagination supply no reason to ignore the law's demands." *Bostock*, 590 U.S. at 653. JR Capital's contrary premise, that a rule may protect no one beyond the class that motivated it, has no basis in law and would unsettle far more than the TCPA.

*Third, and most importantly*, the structure of § 227(c) itself refutes JR Capital's premise, because when Congress intended a *residential-only scope restriction* within § 227(c), it wrote one, in § 227(c)(3), and only there. Section 227(c)(3) authorizes "a single national database to compile a list of telephone numbers *of residential subscribers* who object to receiving telephone solicitations." 47 U.S.C. § 227(c)(3) (emphasis added). That is a genuine limitation on scope. The database must be composed *of* residential subscribers' numbers, and only theirs. Compiling a list "of residential subscribers" is materially different from § 227(c)(1)'s generic statement that the rulemaking concerns the need to "protect" residential subscribers' privacy. Protecting residential subscribers is the *objective* that every § 227(c) method must serve, even while others benefit at the margins. A residential composition requirement is a *boundary* Congress created for

12

one method, the registry, alone. Congress, in short, knew the difference between the beneficiaries of a proceeding and the scope of a particular rule, and legislated accordingly.

The FCC's regulations track that statutory architecture with a draftsman's precision. The registry rule, § 64.1200(c)(2), carries § 227(c)(3)'s express limitation forward, protecting the "residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry." The caller ID rule, § 64.1601(e), which implements no database and rests instead on § 227(c)(1)-(2)'s open-ended "methods and procedures" mandate, carries no residential language at all. Where Congress restricted the method to residential subscribers, the FCC's rule says "residential." Where Congress committed the method to the Commission's judgment, the rule speaks universally. The correspondence is confirmation that the regulatory text means exactly what it says. And this Court has already recognized that § 227(c)(3) "in no way limited the FCC's ability to implement other methods and procedures; it merely permitted a national database as one such method." *Newell*, 791 F. Supp. 3d at 577 n.6.

JR Capital's invocation of *Bowen v. Georgetown U. Hosp.*, 488 U.S. 204, 208 (1988), *see* Def. Mem., ECF No. 33 at 13, adds nothing to the analysis, because it assumes its own conclusion. *Bowen* would matter only if a universal caller ID duty were not a lawful "method[] and procedure[]" for protecting residential subscribers' privacy. For the reasons just given, and for the reasons this Court gave almost a year ago, it is. It is the method the statute's own definitions contemplate, the only design that actually works, and one that Congress's architecture in § 227(c)(3) confirms was never forbidden. There is accordingly no excess of authority for *Bowen* to police, which is presumably why JR Capital, despite gesturing at the FCC's "limited" authority, never actually pleads or seeks a ruling that § 64.1601(e) is invalid as applied to business numbers. What it seeks instead is to "save" the regulation from an imagined overreach

by having the Court insert a limitation Congress and the FCC deliberately omitted. Courts presume "that agencies act within their lawful authority," the very presumption this Court applied in holding that § 64.1601(e) "fits comfortably within § 227(c)." *Newell*, 791 F. Supp. 3d at 576, 579.

And under *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025), JR Capital's own authority, this Court determines the regulation's meaning "under ordinary principles of statutory interpretation." Every ordinary principle, including plain text, the *Russello* presumption, multiple canons of construction, including the surplusage and consistent-usage canons, the reconciliation principle of *LaVallee*, 866 F.2d 616, 623 (3d Cir. 1989), which this Court has already applied to these provisions, and the remedial construction rule, points the same way, § 64.1601(e) applies to all telemarketing, to any recipient.

3.      **Section 227(c)(5) Confirms Congress Gave a Private Right of Action to Any "Person," Not to "Residential Subscribers," and Its Elements Are Indisputably Met Here.**

Were there any residual doubt, the private right of action itself dispels it. Section 227(c)(5) confers a cause of action on "[a] *person* who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5) (emphasis added). The statutory elements are three, and only three: (1) more than one call within a 12-month period; (2) by or on behalf of the same entity; (3) in violation of a regulation prescribed under § 227(c). Residential status is not among them. The substantive content of the violation comes from "the regulations prescribed," which this Court has held the subject regulation is, and § 64.1601(e), as shown, prescribes a universal duty. If the private right of action only applied to residential numbers, and not all persons, Congress would explicitly have said so, but it did not.

14

Congress's choice of the word "person" was no accident. The Communications Act defines "person" to "include[] an individual, partnership, association, joint-stock company, trust, or corporation." 47 U.S.C. § 153(39). Partnerships, trusts, and corporations do not maintain "residential" telephone lines. If Congress had understood every regulation issued under § 227(c) to protect residential lines exclusively, as JR Capital insists, then extending the enforcement right to corporations and joint-stock companies would have been yet more surplusage. Congress instead did precisely what the text reflects. It tied the right of action to violations of *the regulations*, and left the scope of each regulation to that regulation's own terms. So, where the regulation itself protects residential subscribers, as § 64.1200(c)(2) and (d) do, the plaintiff's line status is an element, which is why the parties are litigating it on Counts I and III. And where the regulation imposes a duty owed on every telemarketing call, as § 64.1601(e) does, the recipient's line status is simply not part of the claim. That reading is the only one that gives effect to the different texts the FCC wrote. JR Capital's reading collapses them into one.

The § 227(c)(5) elements are satisfied here on JR Capital's own record with respect to Count II. It is undisputed that JR Capital sent five telemarketing text message calls to Mr. Newell's number, several within twelve months of one another. It is undisputed that the text message calls are the same five text message calls this Court examined at the pleading stage, and the Court has already held that the calls in this form, transmitting a "jrwcap.com" link but never JR Capital's name, violate § 64.1601(e)'s requirement to transmit "the name of the seller." *Newell*, 791 F. Supp. 3d at 584. For that matter, they also could not have been called to lodge an internal do not call request during regular business hours. JR Capital's summary judgment motion does not grapple with its statutory failure and concedes the point. Its sole theory for

15

judgment on Count II is the residential character of the number. But, because that fact is not an element of the claim, the motion fails as to Count II as a matter of law.

4.      **JR Capital's Judicial Estoppel Theory Conflates the Source of the FCC's Rulemaking Authority with the Elements of the Claim.**

JR Capital's remaining gambit is judicial estoppel, reasoning that, because Newell argued at the pleading stage that § 64.1601(e) was promulgated under § 227(c)'s residential privacy rulemaking, Newell cannot now contend that the regulation's duty extends beyond residential lines. Def. Mem., ECF No. 33 at 11-12. But the Court must decline that gambit at the outset. Judicial estoppel requires, at the threshold, a position "irreconcilably inconsistent" with one previously asserted and also requires a showing of bad faith. *Danise v. Saxon Mortg. Servs. Inc.*, 738 F. App'x 47, 50 (3d Cir. 2018). There is no inconsistency here, let alone an irreconcilable one, because JR Capital is comparing answers to two different questions, as explained above. *Which subsection of § 227 authorized* the regulation is a question about the source of the FCC's rulemaking power. *What the regulation requires, and of whom* is a question about the content of the duty the FCC imposed. A regulation can be, and this one is, a method of protecting residential subscribers that operates through a duty owed on every telemarketing call that also benefits subscribers beyond the articulated scope. Purpose and scope are different things.

The proof is this Court's own opinion, which adopted *both* of Newell's now supposedly "inconsistent" positions in the same breath. The Court held that § 64.1601(e) was promulgated under § 227(c), while simultaneously holding that the regulation reaches "[a]ny person or entity that engages in telemarketing," *Newell*, 791 F. Supp. 3d at 583; *see also id.* at 578 (quoting the FCC's directive that "all companies conducting telemarketing" transmit caller ID "regardless of their calling systems"). Indeed, the *breadth* of § 64.1601(e), that it "applies to a broader range of telemarketing calls," *id.* at 579, than the technology-specific categories of § 227(d), was itself a

16

ground of the Court's holding that the regulation belongs to § 227(c). If a universal duty were "irreconcilably inconsistent" with § 227(c) provenance and overarching stated purpose, this Court's opinion would be internally inconsistent. It is not, because there is no inconsistency to be found. Section 227(c) supplies the regulation's purpose and limits the scope in certain places. The regulation tracks the scope articulated by Congress, which provided a remedy to all persons.

The remaining *Danise* factors fail for the same reason. Newell has said the same thing at every stage of this case, including in his very opposition to the motion to dismiss, that the duty is universal and that the purpose is telephonic privacy, so there is no changed position, no bad faith, and no affront to the Court's integrity to remedy. 738 F. App'x at 50. Nor did the Court's denial of dismissal rest on any representation that residential status is an element of Count II; the Caller ID analysis in the Court's opinion does not mention the subject. *See New Hampshire v. Maine*, 532 U.S. 742, 743 (2001) (estoppel turns on whether the party "succeeded in persuading a court to accept" the earlier position such that a later, contrary ruling would suggest a court was misled). What JR Capital labels "estoppel" is, at bottom, a renewed merits argument that § 64.1601(e) must be read more narrowly than it is written. Having litigated and lost the meaning of § 64.1601(e) once, JR Capital cannot relitigate it now under an equitable label. In fact, it is JR Capital that is barred from doing so under the law of the case doctrine. *Arizona v. California*, 460 U.S. 605, 618 (1983) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.").

At bottom, Section 64.1601(e) imposes its caller identification duty on "[a]ny person or entity that engages in telemarketing." The undisputed record establishes that JR Capital engaged in telemarketing to the 4132 number over five times, three after it was begged to stop, within a twelve-month period, without ever transmitting its name or honoring Plaintiff's do not call

requests. Whether the 4132 number is residential or business, those facts state a completed violation of § 64.1601(e), enforceable under § 227(c)(5). Count II therefore survives no matter how the Court resolves the parties' dispute over the character of the number, and summary judgment on the Caller ID Claim must be denied.

**B.      The 4132 Number Is Presumptively Residential, and the Record JR Capital Itself Developed Confirms That Presumption.**

A wireless telephone number registered on the National Do Not Call Registry is presumptively residential. The FCC has established a presumption that "wireless subscribers who ask to be put on the national do-not-call list [are] residential subscribers," even where they also use the number partially for business purposes. *In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14039 (2003). The Fourth Circuit has held the statute's language clear on this point. Registration on the Registry alone renders a number presumptively residential. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (affirming district court's holding). As the Ninth Circuit, in the very decision JR Capital relies on for its five-factor test, has plainly stated, "the FCC has concluded that a cell phone is presumptively residential," and that presumption is the starting point which is JR Capital's burden to overcome. *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1225 (9th Cir. 2022).

JR Capital suggests in passing that, after *McLaughlin*, 606 U.S. 146, the FCC's residential presumption is no longer binding. The suggestion changes nothing here. First, *McLaughlin* directs courts to adopt the best reading of a statute while "affording appropriate respect to the agency's interpretation," *id.* at 152, and the FCC's conclusion that a DNC-registered wireless line is presumptively residential is the best reading, which is why Article III courts have independently adopted it, as well as JR Capital, which has implicitly conceded it. *See Chennette*, 50 F.4th at 1225; *Krakauer*, 925 F.3d at 658. Second, whether Newell in fact used the

18

4132 number as a residential line (to the extent the presumption falls) is a question of fact, not a question of the FCC's statutory interpretation, so *McLaughlin* does not touch it. Apropos of this, JR Capital does not need the presumption to lose this motion, since record developed below permits a reasonable jury to find the 4132 number residential, defeating summary judgment.

The undisputed facts here establish exactly the predicate for that presumption. The 4132 number is wireless. It has sat on the National Do Not Call Registry since before the calls at issue. It is held in Newell's own personal name, on an individual consumer cellular plan, billed to his home address, not on any business account, and not through Newell Contracting LLC. JR Capital's only response to these facts is a *tu quoque*: Newell's business line, it observes, "looks the same on paper," the 1170 number is also wireless, also held in Newell's name, and also to a residential address. Def. Mem., ECF No. 33 at 7, 15. This observation defeats nothing.

The question on this motion is *not* whether a one-man contracting shop's business line resembles a consumer line on paper. Unsurprisingly, it does, but that's irrelevant. The question at bar is whether JR Capital has rebutted the presumption that attaches *to the DNC-registered 4132 number that it called.* That a sole proprietor's business line shares consumer billing characteristics shows, at most, that plan paperwork alone does not resolve the inquiry. It is not evidence that the 4132 number is assigned to "telephone exchange service for businesses," as the regulation requires. 47 C.F.R. § 64.2305(b), (d). JR Capital has adduced no such evidence. And the FCC's presumption expressly survives even where the wireless subscriber uses the number partially for business purposes, 18 FCC Rcd. at 14038-39, the presumption exists for precisely this situation, and it is JR Capital's burden, not Newell's, to overcome it with evidence. Wireless subscribers, and each of them "may participate in the national do-not-call list." *Id.*

Because the 4132 number is presumptively residential, and because JR Capital's own discovery record confirms rather than rebuts that presumption, JR Capital's motion should be denied on this basis alone.

## C. At Minimum, Genuine Disputes of Material Fact Preclude Summary Judgment on Whether the 4132 Number Is a "Business" Number.

Even setting the presumption aside, JR Capital has not carried its burden of showing that no reasonable jury could find the 4132 number residential. JR Capital's entire "business number" theory rests on three records, the purchased Dun & Bradstreet marketing record from which it actually obtained the number, and two government registry entries it discovered later. None of the three reflects a representation by Newell that the 4132 number is his business's line, and the first, on inspection, does not identify a business number at all.

### 1. The Dun & Bradstreet record the only record JR Capital actually relied upon, identifies no business number, and JR Capital's designee could defend it only with circular say-so.

Start with the record JR Capital admits it used. Its brief tells the Court that "[t]he information Dun & Bradstreet supplied . . . identified the business's number as the 4132 number." Def. Mem., ECF No. 33 at 8. The record itself says no such thing. As JR Capital's own supplemental interrogatory answer sets out, the exported record's telephone fields are labeled "Direct Phone" and "Phone 2," not "business phone." (Ex. 5, Resp. No. 8.) At his deposition, JR Capital's designee could not say whether the field read "phone" or "business phone," and when pressed on the distinction, deferred to the interrogatory answer that resolves it against JR Capital. (Ex. 1 at 23:15-24:18.)

What's more, when asked directly on multiple occasions what the records *actually* say and where in the records Mr. Newell's number is identified as a business, Mr. Robbins could only parrot the same response over and over again: Dun and Bradstreet records are business

records. When asked, "Where does it say that this is his business number?", Robbins answered: "Well, all records from Dun and Bradstreet are businesses." (Ex. 1 at 29:19-22.) Asked whether JR Capital has any practice of checking whether a purchased number is business or residential: "All records from Dun and Bradstreet are businesses." (Ex. 1 at 21:17-23.) Asked how the number was confirmed to be a business number: "it was confirmed through the fact that we bought a database from Dun and Bradstreet, which are all businesses." (Ex. 1 at 22:9-14.) That is not evidence, let alone sufficient evidence to meet the heavy burden at summary judgment. It is instead a tautology resting on inadmissible hearsay, "[w]e are told that the entire database is for businesses" (Ex. 1 at 23:10-11), about a database whose underlying sourcing JR Capital's designee admits he does not know. (Ex. 1 at 23:2-5.)

Mr. Robbins was asked at least four different questions in this regard and gave but one rehearsed answer. And when a question could not be met with the formula, a direct question as to what the records actually show and whether the record's telephone field actually reads "phone" or "business phone," Paris Robbins could not answer it at all. He turned to JR Capital's counsel during JR Capital's own 30(b)(6) deposition, on the record, and said: "Scott, we sent that over. Right?," whereupon counsel, Mr. Helfand, not the witness, located the interrogatory response and directed the examination to it. (Ex. 1 at 23:15-24:18.) The company's designated corporate voice did not know what his company's own record said until his lawyer told him where to look.

The same pattern repeated when Mr. Robbins was shown Newell's August 7, 2023 email, a personal Gmail message, sent under Newell's own name, with no reference to any business. Mr. Robbins' testimony lurched in real time: "Oh, looks like it's from his personal name. . . . Wait, let me — let me see that again. Looks like this is from his — his business." (Ex. 1 at 35:3-9.) Pressed for what in the email referenced a business, he could identify nothing except that JR

Capital had "reconciled the phone number in the email to Newell's business in our CRM," a position that is materially inconsistent with Mr. Robbins' previous testimony that JR Capital had supposedly "missed" the email. (Ex. 1 at 35:21-36:1, 32:20-25.) Once made to read the email aloud, he conceded the residential point entirely: "Q. Does Mr. Newell say that this is his business telephone number? A. No. Q. He says it's a cell phone number. Right? A. That's what he says, yeah." (Ex. 1 at 36:20-37:1.)

A defendant seeking summary judgment on facts it must prove, including an affirmative defense on which it bears the burden, must present evidence so one-sided that a reasonable jury would be compelled to accept it. A designee who answers every material question with a single canned response, defers to counsel for the contents of his own company's records, and abandons his characterizations the moment he is required to read the underlying document is not that evidence. At most, the testimony presents exactly the credibility assessment for a jury.

What the written record does say undermines JR Capital's theory. The "Company Name" it lists is "Newell, Jourey," Newell's personal name. The address it lists is a residential address. And the business it describes is a landscaping operation "founded" in 2016, a stale snapshot of the part-time landscaping sideline that had ceased using the 4132 number as its outward-facing number in October 2018, four years before JR Capital bought the data in 2022. (Ex. 4 at 19:6-11; 20:2-7.) The record does not describe Newell Contracting LLC, the home improvement contractor and motor carrier whose registrations JR Capital's motion features, because that entity did not yet exist. Newell never submitted anything to Dun & Bradstreet and had no role in creating or maintaining its listing. Most importantly, JR Capital was told, directly, in writing, and in Newell's own name, that the 4132 number was a personal cellular telephone and that Newell had never consented to be contacted on it. Its answer was to keep sending text message calls for

22

another eighteen months. A defendant that disregards the plaintiff's explicit, contemporaneous do-not-call demand and statements that the number is a personal cell phone in favor of stale data it purchased cannot credibly claim that the plaintiff misled it or concealed the number's purpose. The only party who misled anyone here was JR Capital, and it misled itself.

The address field in the same record makes JR Capital's position still weaker. JR Capital asks the Court to treat a commercial marketing database as dispositive, objective proof that the 4132 number was a business line, but the very record JR Capital purchased ties the number to a residential address. An address is not an unknowable or subjective datum. The United States Postal Service maintains classifications of each delivery point as a residence or a business, and the Postal Service has coded the subject address as a residential one. *See Look Up a ZIP Code*, USPS, https://tools.usps.com/zip-code-lookup.htm?byaddress. Thus, to the extent JR Capital contends it was reasonable to rely mechanically on the Dun & Bradstreet record, the objective address level data in that same record, not to mention the name data, cuts the other way. The record associated the number with a residential delivery point, not a commercial premises. It is at least unreasonable, and certainly not undisputed, to treat a personal cell phone as a "business number" based only on a vendor's hearsay statements while ignoring that the very data itself points to a residential address. A record that lists an individual's personal name in the "Company Name" field, a bare "Direct Phone," and a residential delivery address, does not represent that the telephone number is a business line. Rather, it announces, on its face, that the marketer is about to call a person at home. JR Capital did not misread those indicators. By its designee's own account, it never looked and never complained. (Ex. 1 at 47:17-21.)

On this record, a reasonable jury could readily find and indeed, would be hard pressed not to find, that what JR Capital bought was a data broker's years-stale scrape of personal cell

phone numbers, not a representation by Newell of anything. *See Thomas v. Dun & Bradstreet Credibility Corp.*, 100 F. Supp. 3d 937, 943-44 (C.D. Cal. 2015) (subscriber's appearance in a Dun & Bradstreet business database did not strip a personal cell number of TCPA protection and noting that "the facts as alleged suggest Defendant called a residential number"). It would be especially reasonable to find when JR Capital ran no line type identification (Ex. 1 at 37:12-24) and maintained no practice of checking whether any purchased number was residential (Ex. 1 at 21:17-23). Reliance on a vendor's marketing claim that other Courts have rejected, *see Thomas*, and on a record that contradicts what it was sold for on face, is not reliance on the nature of anything. JR Capital's response to all this, that "everyone knows" Dun & Bradstreet sells business records, is exactly the sort of hearsay, self-serving, unsupported statement that appears nowhere on the record it purchased. A defendant's assumptions about the data it purchased are not undisputed facts about the nature of Mr. Newell's telephone.

> **2.    The Attorney General's registry reflects Newell's entry in a personal contact field, not a representation that 4132 is Newell Contracting's business number.**

JR Capital makes much of the fact that a search of the Pennsylvania Attorney General's contractor registry returns the 4132 number next to Newell Contracting's name. But JR Capital's own exhibit, and Newell's undisputed deposition testimony, show why that is not evidence that Newell held 4132 out as his business's number. The registration application asks for two different numbers in two different places: a "Business Telephone Number" in the business-information section, and a "Personal Telephone Number" in a separate "Point of Contact" section. (Ex. 2.) Mr. Newell testified that he would have put Business Phone Number as 1170, and his Personal Telephone Number as 4132, exactly as the form's structure calls for. (Ex. 4 at 49:10-12.) He testified that he does not "put that 4132 number out there as a business number for people to contact." (Ex. 4 at 55:22-23.) The registry's public search function does not distinguish

24

between the two fields when it displays results. That is a limitation of the state's own database design, not a representation by Newell.

This is precisely the situation courts have addressed when a defendant seizes on a database anomaly or a third-party field to manufacture a "business number" argument. Newell's own sworn testimony shows his number is not a business number and he never intended it to be as such. A form's request for a "cell phone" or "personal" number, dutifully answered, is not evidence of a business number; if anything, it is evidence of the opposite. *See e.g.*, *Connor v. ServiceQuick, Inc.*, No. 1:24-CV-02286-CNS-NRN, 2025 WL 2855393, at *2 (D. Colo. Oct. 8, 2025) (allegation that a plaintiff's number "is not associated with a business and is used for personal purposes" was sufficient to establish residential status, notwithstanding an online listing the plaintiff did not create).

JR Capital's own authorities involve nothing like this record. In *Bank v. Indep. Energy Grp. LLC*, the court found a plaintiff's number to be a business line only after the defendant came forward, at summary judgment, with evidence that the number appeared on the plaintiff's professional letterhead and business cards, in his signature block in court filings, in his attorney registration with the state court system, and that he personally gave the number to clients and other attorneys. No. 12-CV-1369, 2015 WL 4488070, at *2 (E.D.N.Y. July 23, 2015). JR Capital has nothing comparable: no letterhead, no business card, no advertisement, and no testimony that Newell ever gave the 4132 number to a customer as "the Newell Contracting number." The only evidence JR Capital has is a database field that, by its own terms, asks for a personal number.

Nor is there any evidence the registry entry ever functioned as a business listing in the real world or that JR Capital relied upon it. Newell testified that "no one has ever called me saying, 'Hey, I searched up on home improvement contractor website, and I'm reaching out to

25

you today because your number is listed.'" (Ex. 4 at 57:10-14.) The registry, as Newell explained, is a verification that a contractor is licensed: "it's more to verify something where they've already been in contact with me," not an advertisement. (Ex. 4 at 58:12-17.) And the registry printout JR Capital submits is for a business that did not even exist at the time JR Capital sent its initial text message calls to Plaintiff.

### 3. The FMCSA listing likewise reflects a personal contact field, and Newell corrected it as soon as he learned it was publicly displayed.

JR Capital's second data point fares no better. The MCS-150 registration form with the Federal Motor Carrier Safety Administration (FMCSA) that Newell completed asks separately for a "Principal Business Phone Number" and a "Principal Contact Cell Phone Number." (Ex. 3.) FMCSA's own instructions describe the latter as exactly what its name suggests, a personal contact number distinct from the carrier's business line, and in fact explicitly outline that a "business phone number" "may be a cell phone number." (*Id.*) Newell's sworn testimony confirms that he entered the 4132 number not as the business number, but instead as his personal cell phone, in accordance with the application's prompt for a cell phone number, and as soon as Newell "became aware of the phone number that was being displayed," he corrected the listing to show the 1170 number instead. (Ex. 4 at 104:12-15, 110:3-6.) A form entry made in a field expressly designated for a personal contact number, corrected the moment the registrant learned it was publicly visible, is not evidence that compels a finding that the number was held out as a business line. At most, it creates a factual dispute for trial.

Even taking JR Capital's characterization of these two exhibits at face value, they are a far cry from the failure to adduce evidence that supported summary judgment in the cases JR Capital cites. In *Stevens-Bratton v. TruGreen, Inc.*, the Plaintiff adduced no testimony, other than an "affirmation" that she used her number for residential purposes and "submitted only a scintilla

26

of evidence to assist this fact-intensive determination." 437 F. Supp. 3d 648, 658 (W.D. Tenn. 2020). And in *Lee v. Loandepot.com, LLC*, the Plaintiff likewise came forward with no "evidence showing how he used his cellular phone." *Lee v. Loandepot.com, LLC*, No. 14-CV-01084-EFM, 2016 WL 4382786, at *7 (D. Kan. Aug. 17, 2016).

JR Capital adduces no evidence to show that presence on a government form's personal contact field that happens to be publicly searchable (not to mention promptly corrected) is evidence of business use. The closest it comes is *Bank*, addressed above, and *Shelton v. Target Advance LLC*, where the undisputed record showed the plaintiff was actively conducting business on the number at the time of the calls at issue by holding it out to the world as a business number on his website. No. CV 18-2070, 2019 WL 1641353, at *5 (E.D. Pa. Apr. 16, 2019). Here, Plaintiff has not held the number out to the world as a business number, and JR Capital has no comparable evidence here. Newell's testimony about the FMCSA registration only confirms the point. A government registration is a compliance obligation, not a marketing channel, and as Newell put it, "I never imagined that I would be gaining customers through the US DOT number. . . . it would be a bizarre channel to be gaining any customers," because the registration is "something you need to do to remain compliant" and "less to do with putting information out there for potential customers." (Ex. 4 at 98:9-19.) Moreover, adopting JR Capital's argument would have enormous implications for public policy, since business owners would be incentivized to provide only business numbers on such applications, despite government agencies needing to contact cell phones in certain cases, like emergencies.

JR Capital's dismissal of Newell's testimony as an implausible "tale," Def. Mem., ECF No. 33 at 15, gives away the game. Its cases, *Stevens-Bratton* and *Lee*, rejected conclusory "residential" declarations. But here, Plaintiff has not only testified as to the residential uses of his

27

number, he has had those assertions tested by JR Capital who has (extremely invasively) subpoenaed the Plaintiff's telephone records and uncovered, unsurprisingly, residential use, including calls to his parents, grandmother, and friends. Newell's story matches Newell's testimony about how he completed the subject forms. (*See generally* Ex. 4 at 45:1-12; 49:9-12.) When a movant's path to judgment requires the Court to disbelieve the nonmovant's sworn, corroborated testimony that was proven on a fair examination and to declare it a "tale," the motion answers itself: credibility determinations are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

### 4. Newell's actual business number for Newell Contracting LLC is 1170, and his incidental use of the 4132 number does not convert it into a business line.

Newell has a real business number, and it is not the 4132 number. Newell has identified his 1170, not 4132, number in his deposition as the number that he as "always maintained" for business purposes. (Ex. 4 at 18:4-7.) That Mr. Newell occasionally fields a stray call on the 4132 number, from a family member who shares the number with someone needing contracting work, or from a long-time customer who knew Newell before he obtained the 1170 number in 2018 and has not updated his contacts, does not transform a personal cell phone into a business line. *See Mattson v. New Penn Fin., LLC*, No. 3:18-CV-00990-YY, 2020 WL 6270907, at *2 (D. Or. Oct. 25, 2020) ("Although Mattson's use of a phone line for personal calls does not automatically transform it into a residential line for purposes of the TCPA, neither does his use of a personal line for business calls automatically transform it into a business line."); *Smith v. Truman Rd. Dev., LLC*, No. 4:18-CV-00670-NKL, 2020 WL 2044730, at *12 (W.D. Mo. Apr. 28, 2020) (denying summary judgment and holding that factual issues as to a 60% use of number for residential purposes raised a disputed fact that could lead a reasonable jury to find that the plaintiff's number was residential); *Thomas*, 100 F. Supp. 3d at 943.

At minimum, how often and for what purpose Newell used the 4132 number in connection with the business are quintessential jury questions on this record, not questions this Court can resolve as a matter of law. JR Capital's suggestion that Newell's testimony is disqualified as "self-serving" misstates the law. In this Circuit, "a single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment," even if "self-serving." *Lupyan v. Corinthian Colls. Inc.*, 761 F.3d 314, 320 (3d Cir. 2014). The sham-affidavit rule JR Capital gestures toward applies only where sworn testimony *contradicts* the witness's own prior testimony without explanation, *see id.*, which is not the case here, where Newell's account is consistent across his interrogatory responses and deposition and is corroborated by his subpoenaed call records.

This Court has already observed that whether the 4132 number "is actually a residential, non-commercial number" presents "a dispute of fact" that is "fact-specific" and evaluated on a "case-by-case" inquiry. *JR Cap.*, 791 F. Supp. 3d at 575 n.1. What was a fact dispute unsuited to Rule 12 has only sharpened against JR Capital through discovery, and is equally unsuited to resolution in JR Capital's favor at the summary judgment stage. Because JR Capital frames its motion around the factual inquiry described by the divided court in *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1225 (9th Cir. 2022), which is itself persuasive but not binding, it is worth noting that those factors on this record, at best for JR Capital, present jury questions.

Start with registration and payment. It is undisputed that the 4132 number is a wireless line held in Newell's personal name, on an individual consumer plan, billed to his home, as ascertainable and verifiable from the records of Mr. Newell's telephone carrier itself (and telephone carriers more generally). Those factors point to residential use, and JR Capital's only answer, that Newell's separate business line looks the same on paper, is precisely why the FCC's

29

cellular presumption exists and why the remaining factors, and the DNC registration, control. Next, Mr. Newell has not held the number out to the world as a business number. As shown here, the only action Mr. Newell took that could conceivably even come close is his entering the number only in fields in two government forms designated for a personal or cell phone contact. Mr. Newell corrected the one he learned was displayed, never advertised it, and never gave it to a customer as "the Newell Contracting number." Moreover, a reasonable observer of the very record JR Capital purchased would have seen a personal name in the "Company Name" field, a bare "Direct Phone," and a residential address, and, had JR Capital run a line-type check it admits it never ran, a DNC-registered consumer cell line. And finally, Mr. Newell also does not receive reimbursement or payment for his personal cellular telephone number from a business. No single factor resolves this inquiry as a matter of law, and certainly not in JR Capital's favor.

JR Capital's fallback, that before October 2018, the 4132 number served as the sole contact number for Newell's landscaping business, Def. Mem., ECF No. 33 at 15, proves too little, too late. So much is evident from JR Capital's assertion (citing no one) that Mr. Newell uses his telephone number for business purposes "several times a week." Nowhere in Mr. Newell's testimony did he make that statement. This mischaracterization notwithstanding, the character of a line is assessed *at the time of the* challenged calls, as this Court has already held. *Shelton v. Pro Source Lending Grp. LLC*, No. CV 24-4394, 2025 WL 817485, at *4 (E.D. Pa. Mar. 14, 2025) (holding it is possible for a business number to return to residential use). In *Shelton*, the plaintiff's telephone number was used for both business and personal purposes in 2019, but used exclusively for personal use since that time. Given the nearly five years that had passed since the plaintiff last used the number for business use, this Court held that defendant "could [not] reasonably rely on how Plaintiff engaged with the public five years earlier," and that

defendant "could have checked whether Plaintiff's number was still listed on business websites or on Google as affiliated with his business before proceeding." *Id.* at \*5.

JR Capital's first text message call arrived on November 4, 2022, more than four years *after* Mr. Newell started using the 1170 number as his business's outward-facing number. (Ex. 4 at 19:6-11; 20:2-7.) That a personal cell phone once did partial duty for a part-time landscaping sideline, years before the calls at issue, does not make it a business line in 2022, particularly when the FCC's presumption expressly accommodates wireless numbers used partially for business purposes. *See* 18 FCC Rcd. at 14038-39. If a number's history of any business contact stripped it of protection, that would be a dead letter for every sole proprietor in America.

**D.    Even If a Fact Dispute Did Not Independently Preclude Summary Judgment, JR Capital's Equitable Estoppel Defense Fails on Its Own Terms.**

**1.    Equitable estoppel is JR Capital's burden, and summary judgment on an affirmative defense requires more than a plausible story.**

Equitable estoppel is an affirmative defense on which JR Capital bears the burden of proof. A defendant moving for summary judgment on a defense for which it bears the burden of proof must adduce evidence supporting every element of that defense sufficient that a reasonable jury would be compelled to find in its favor. Grounded in common law, equitable estoppel prevents a party from enforcing a right against another party when the right was gained through misleading actions. The party asserting equitable estoppel must show "(1) a misrepresentation by another party; (2) which he reasonably relied upon; (3) to his detriment." *U.S. v. Asmar*, 827 F.2d 907, 912 (3d Cir. 1987).

This court has already rejected a materially similar equitable estoppel argument at the pleadings stage in *Pro Source*. There, the defendant claimed that the fact that the plaintiff's number appeared on a business website at some point in time, and which was adjudicated against plaintiff at summary judgment previously, "placed Pro Source in a "gotcha" – making it

31

impossible for Pro Source to discern when a cause of action that was previously declared unavailable became available yet again." This Court rejected that argument reasoning that:

> If Plaintiff took down the number from his business website and then immediately sued Pro Source or another marketer, I would be strongly inclined to find estoppel. But nearly five years have passed during which Plaintiff avers personal use only. Such a change in circumstance, if ultimately proven to be true, is not easily categorized as a misrepresentation. And it cannot be said that Pro Source could reasonably rely on how Plaintiff engaged with the public five years earlier. Legally, the onus is on Defendant to ensure that the number they are calling is not protected by the NDNC. With the number remaining on the NDNC, Pro Source could have checked whether Plaintiff's number was still listed on business websites or on Google as affiliated with his business before proceeding. The passage of time weighs against a finding of estoppel.

2025 WL 817485, at *5. JR Capital cannot clear the bar on either of the first two elements.

> **2.    Newell made no misrepresentation to JR Capital, or to anyone, that the 4132 number was a business line.**

As explained in Section C above, Newell did not hold the 4132 number out to the public, let alone to JR Capital, as Newell Contracting's business number. He entered it in fields that two different government forms designated for a personal or cell phone contact, distinct from the business line fields on those same forms, which he filled in with his actual business number. He filled out those applications years after JR Capital even received the Plaintiff's information, and he testified that he does not put the 4132 number out as a business number for people to contact. (Ex. 4 at 55:22-23.) A misrepresentation is the first and most basic element of equitable estoppel, and JR Capital has not identified one.

> **3.    JR Capital did not rely on either public listing. It obtained the 4132 number from a commercial database, not from Newell.**

Equitable estoppel also requires reasonable reliance, and the undisputed record shows JR Capital relied on nothing Newell said or did. JR Capital's own corporate designee testified that JR Capital identifies businesses to contact by subscribing to a Dun & Bradstreet database that JR Capital purchased in 2022. (*See generally* Ex. 1 at 14:5-12; 20:2-5; 46:11-13; 47:13-16; 52:16-

22.) That database, not the Pennsylvania Attorney General's contractor registry, and not Newell's FMCSA filing, is where JR Capital obtained the 4132 number, along with Newell's personal name and a residential address. (*Id.* at 17:3-13; 28:14-29:12; 42:12-20.) JR Capital has identified no evidence, because none exists, that anyone at JR Capital ever viewed, verified, or relied upon either public registry before calling the 4132 number, let alone later relied on either one in continuing to do so after the Plaintiff represented to JR Capital that the number *was his residential number.* That is the opposite of reasonable reliance. An estoppel defense premised on reliance on a representation the defendant never saw, and contradicted by one made by the Plaintiff himself is not one a reasonable jury would be compelled to accept. It is no defense at all.

Indeed, reliance is not merely unproven, it is *chronologically impossible.* Both registrations belong to Newell Contracting LLC, an entity formed in October 2023. (Ex. 4 at 34:1-3; 46:16-23; 96:20-97:17.) JR Capital admits it received the 4132 number from Dun & Bradstreet in 2022 and sent its first call on November 4, 2022, nearly a year *before* the entity whose "public representations" it claims to have relied upon existed or the applications were made. (Ex. 5, Resp. No. 8.) A defendant cannot be "induced" to act by representations that had not yet been made. JR Capital did not even know where it had obtained the number until this lawsuit forced the question, and that the Dun & Bradstreet source was identified only "through further investigation." (Ex. 1 at 19:7-12.) A company that could not identify its own source until litigation cannot have reasonably relied on sources it had never looked at.

Worse still for a defense that sounds in equity, the one representation that Mr. Newell *actually made* to JR Capital said the opposite of everything JR Capital claims to have relied upon. On August 7, 2023, with three of the five calls still to come, Newell wrote to JR Capital demanding that it "cease and desist all telemarketing calls to my mobile telephone," describing

33

the 4132 number as his "cellular telephone number," and requesting JR Capital's do not call policy. (Ex. 6; Ex. 1 at 36:11-19.) JR Capital somehow logged the email against Newell's number in its CRM but claims it kept sending text message calls anyway because "human error" caused it to "miss[]" the email. (Ex. 1 at 32:6-33:8; 36:20-37:9.)

JR Capital's brief asserts that "[h]ad Newell's public listings disclosed what Newell now claims (i.e., that the 4132 number is a residential line), JR Capital would not have contacted it." Def. Mem., ECF No. 33 at 19. Notwithstanding that fact that the public listings weren't even created at the time of the first calls, Mr. Newell disclosed exactly that, in writing, directly to JR Capital, in August 2023, and JR Capital contacted the number anyway, into February 2025. Equitable estoppel exists to protect a party misled by another's conduct. It is not available to a defendant that disregarded the plaintiff's direct, contemporaneous disclaimer of the very estoppel argument on which it relies. Indeed, JR Capital's designee could not explain even that email except through his rehearsed response. He described Newell's personal Gmail message, sent under Newell's own name, with no reference to any business, as "Newell's business contacting us." (Ex. 1 at 32:20-22; 34:14-35:9.) That ostrich-like blindness is JR Capital's entire defense in miniature. Everything it calls is supposedly a "business," even when it is told otherwise.

### 4.    *Pro Source* **Helps Plaintiff, Not Defendant.**

JR Capital leans entirely on this Court's observation in *Pro Source* that, "[i]f Plaintiff took down the number from his business website and then immediately sued [the defendant] or another marketer, I would be strongly inclined to find estoppel." No. CV 24-4394, 2025 WL 817485, at 5 (E.D. Pa. Mar. 14, 2025). But that is not the circumstance created by this case. JR has been unable to identify any website or any other material created by the Plaintiff, because

none exists, whereby Mr. Newell held the number out to the world as his business number, and he has testified that he has not done so for at least eight years, far more than the five in that case.

As explained above, *Pro Source* shows why the Court should not find estoppel. There, the plaintiff had himself posted a number on his own business website, *lost a summary judgment brief on the issue*, removed the number from his website, and then got calls more than five years after the fact. Notwithstanding that Mr. Newell did not create a business website listing the 4132 number, take it down, and then sue, that fact pattern, and the affirmative additional actions of the plaintiff in *Pro Source*, shows why this is an easier case for denying estoppel where Plaintiff, after the fact, submitted his number in personal contact fields on two government forms, one of which he corrected as soon as he learned of the public display, neither of which Defendant relied on, and in the face of affirmative representations to the contrary.

## Conclusion

For the foregoing reasons, JR Capital's motion for summary judgment should be denied. As to Count II, the motion fails at the threshold, since § 64.1601(e)'s caller identification duty applies to *every* telemarketing call and text message call regardless of the character of the called line. As to the other counts, the 4132 number is presumptively residential, and JR Capital's own discovery record confirms that presumption rather than rebutting it. At minimum, genuine disputes of material fact, including about what the two government forms said, what JR Capital relied on and its ability to demonstrate business use, and about how Mr. Newell *actually* used the number, preclude summary judgment on the residential/business question. And JR Capital's estoppel defenses fail for the independent reason that JR Capital cannot plead reliance, among the other elements.

35

RESPECTFULLY SUBMITTED AND DATED this July 3, 2026.

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
Pa. Bar #333687
Perrong Law LLC
1669 Edgewood Road, Suite 218
Yardley, PA 19067
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

*Attorney for Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

I, Andrew Roman Perrong, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

DATED this July 3, 2026.

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.