IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \* \*

JOUREY NEWELL,        \*

individually and on \*

behalf of all others\*

similarly situated, \*

    Plaintiffs      \*Case No.

    vs.             \*2:25-cv-01419-GAM

JR CAPITAL, LLC,     \*

    Defendant        \*

\* \* \* \* \* \* \* \*

DEPOSITION OF

PARIS ROBBINS

May 27, 2026

Any reproduction of this transcript is

prohibited without authorization by

the certifying agency.

2

DEPOSITION

OF

PARIS ROBBINS, taken on behalf of the Plaintiffs herein, pursuant to the Rules of Civil Procedure, taken before me, the undersigned, Samantha Bruer, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, Via Zoom, on Wednesday, May 27, 2026 beginning at 3:59 p.m.

4

I N D E X

WITNESS: PARIS ROBBINS

EXAMINATION

  By Attorney Perrong        7 – 56

DISCUSSION AMONG PARTIES     56 - 57

CERTIFICATE                  58

3

A P P E A R A N C E S

ANDREW ROMAN PERRONG, ESQUIRE
Perrong Law, LLC
2657 Mount Carmel Avenue
Glenside, PA  19038
    COUNSEL FOR PLAINTIFFS

SCOTT HELFAND, ESQUIRE
Husch Blackwell
120 South Riverside Plaza
Suite 2200
Chicago, IL  60606
    COUNSEL FOR DEFENDANT

5

EXHIBIT PAGE

                    PAGE
NUMBER  DESCRIPTION      IDENTIFIED
Exhibit 1  Supplemental
      Response        26
Exhibit 2  Email          34
Exhibit 3  Order Form      50

14

answer, you can answer the question.
A. Which list are you referring to?
Q. Let's start with my next question, which is where did JR Capital obtain the Plaintiff's telephone number from?
A. Dun and Bradstreet.
Q. And that Dun and Bradstreet List, do you handle the purchasing of that list?
A. Yes.
Q. What did you do to prepare for today's deposition?
A. I met with counsel.
Q. For approximately how long did you meet with counsel?
A. I would say several hours.
Q. Did you speak with any current or former JR Capital employees to prepare for your deposition?
A. I specifically met with my executive team.
Q. Who on your executive team did you meet with?

16

obtaining to?
BY ATTORNEY PERRONG:
Q. Relating to this lawsuit?
A. No.
Q. Did you speak with anybody at Dun and Bradstreet relating to this lawsuit?
A. No.
Q. Did you review any documents in preparation for today's deposition?
A. Yes.
Q. What documents did you review?
A. The supplemental --- the supplemental ---.  Sorry, can you show them to me?  Because I can't remember the name of all the documents.  But the documents that were sent in prior to this meeting were all reviewed.
Q. Did you review JR Capital's CRM system?
A. Yes.
Q. What CRM system does JR Capital use?
A. Salesforce.
Q. Did you --- what did you review

15

A. Jon Wasser, our CEO.  Robert Mulato, also known as Bobby Mulato, who's our president and Dillon Taggett was our chief risk officer.
Q. And what did you discuss in at that meeting?
ATTORNEY HELFAND:
Objection.  Don't answer that.  Attorney/client privilege.  He means we met with the group.
ATTORNEY PERRONG:
Okay.
BY ATTORNEY PERRONG:
Q. Was your attorney present at that meeting?
A. Yes.
Q. Did you speak with anybody at Fleet Seek (phonetic) or Randall Reilly?
ATTORNEY HELFAND:
Objection.  Form.
THE WITNESS:
Can you specifically state what the discussion was

17

in JR Capital's CRM system with respect to this lawsuit?
A. Where we got the --- where we got Newell's business contact.
Q. And what did that review reveal?
A. It reviewed --- it revealed that it is a business and we got it from Dun and Bradstreet.  It also specifically stated the SIC code, the address to the customer --- the address to the business and also the --- the phone number to the business.
Q. What address to the business was provided?
A. If you show it to me --- I don't have it.  I think it was 409 Brandywine going off memory.
Q. Did you provide those CRM records to your lawyers?
A. Yes.
Q. To whom does JR Capital markets its financing services?
A. Businesses.
Q. What specific businesses?

18

A. Literally any business that's buying equipment throughout America.

Q. Is one of the ways that JR Capital Markets by sending text messages?

A. Yes.

Q. And from where does it obtain the phone numbers that it sends those text messages?

ATTORNEY HELFAND:
Objection to scope.
Andrew, I'm giving you some leeway, but let's keep it focused on Mr. Newell.

THE WITNESS:
We got Newell's business contact information from Dun and Bradstreet, which is a database for businesses throughout America.

BY ATTORNEY PERRONG:

Q. Does JR Capital also use Fleet Seek and Randall Reilly?

A. Yes.

Q. Was Mr. Newell's information

19

obtained from either Fleet Seek or Randall Reilly?

A. No.

Q. How then does Fleet Seek and Randall Reilly fit into this litigation?

A. At the time, we believed that we got Newell's business contact information from Fleet Seek or Randall Reilly. But through further investigation we found it actually came from Dun and Bradstreet.

Q. Do you have a copy of that Dun and Bradstreet record with --- with respect to the Plaintiff?

A. Yes.

Q. We'll follow up with you on that. What specifically did JR Capital request for purchase from Dun and Bradstreet with respect to the Plaintiff's number?

A. Just all information pertaining to Newell's business that they had.

Q. So does JR Capital just go to Dun and Bradstreet looking for

20

information on specific businesses?

A. No. We get it --- we had a subscription. I believe it was a one year subscription where we're allowed to get business information.

Q. So that subscription, does that --- is that for all sorts of industries or is it limited to specific businesses or how does that access operate?

A. I don't know all of Dun and Bradstreet's industries and services, but I can tell you that we are interested in serving any business throughout America.

Q. So you --- what was the scope of the lead --- or of the data containing Mr. Newell's number from which you purchased from Dun and Bradstreet?

ATTORNEY HELFAND:
Objection. Form.

THE WITNESS:
Can you --- can you rephrase the question?

21

BY ATTORNEY PERRONG:

Q. Yes. What was the scope of the data that you purchased from Dun and Bradstreet that included the Plaintiff's numbers? So, for example, did you request from Dun and Bradstreet all makeup artists in a 10 year --- in a 10 mile radius, all construction companies in the State of Pennsylvania? What specifically did you ask for from Dun and Bradstreet to obtain the Plaintiff's number?

A. We just asked to get access --- well, not we asked. We purchased full access to all businesses throughout America, and he was one of them.

Q. Does JR Capital have any practice of separately checking whether a number is a business number or a residential number after it obtains it from Dun and Bradstreet?

A. All records from Dun and Bradstreet are businesses.

Q. So JR Capital relied on Dun and Bradstreet's representations that the

22

numbers were business numbers.

A. Correct.

Q. And that comes from the list itself, not something that JR Capital independently confirmed. Correct?

ATTORNEY HELFAND: Objection. Form.

THE WITNESS: Well, it was confirmed through the fact that we bought a database from Dun and Bradstreet, which are all businesses.

BY ATTORNEY PERRONG:

Q. In what form did Dun and Bradstreet provide you the Plaintiff's telephone number?

A. Well, what --- like how do we --- how do we get it from ---?

Q. Yeah. Is it a file? Is it an upload?

A. Yeah, it's a file. You have a --- you have --- you have access to like a profile, and then you can

23

export records.

Q. Do you know where Dun and Bradstreet obtained the Plaintiff's telephone number from?

A. I do not.

Q. Does Dun and Bradstreet identify whether or not a telephone number is residential or --- a residential landline or a cell phone?

A. We are told that the entire database is for businesses.

Q. Does it distinguish between personal cell phone numbers and other ---?

A. I can specifically say, like on the field, cell phone, no, it just says business phone number or phone number.

Q. Okay.

A. I believe it just says phone or business phone.

Q. I think that's a big distinction. So does it say phone or does it say business phone?

A. Scott, we sent that over.

24

Right?

ATTORNEY HELFAND: Yeah. Andrew, we provided the fields from the D&B data in the supplemental and amendment interrogatory responses. So if you want to refer Mr. Robbins to that, he can probably walk you through it more easily.

ATTORNEY PERRONG: The interrogatory responses or the production?

ATTORNEY HELFAND: The interrogatory responses. We just --- we included the fields from the D&B data.

THE WITNESS: In the supplemental response. Right?

ATTORNEY HELFAND: Right.

THE WITNESS:

25

Yeah.

ATTORNEY HELFAND: I think it's number 11, Andrew, but you can correct me if I'm wrong.

ATTORNEY PERRONG: I don't see where those fields are. But I could be --- oh, I'm not looking at the supplements. That's why.

ATTORNEY HELFAND: It happens.

BY ATTORNEY PERRONG:

Q. Okay. So it's --- so the Dun and Bradstreet information states direct phone. Correct?

ATTORNEY HELFAND: If you're asking about the document, it's probably better just to show it to him.

ATTORNEY PERRONG: That's fine. Okay.

26

I'm going to bring up your supplemental responses and we'll mark this as Exhibit 1.

---

(Whereupon, Exhibit 1, Supplemental Response, was marked for identification.)

---

ATTORNEY HELFAND: Andrew, can you drop those in the chat or do you just want to email them?

ATTORNEY PERRONG: I'm doing that right now.

ATTORNEY HELFAND: Okay. I was going to say, or unless it's easier just email them over, as we did with Mr. Newell's deposition. But it looks like you got them in the chat.

THE WITNESS:

27

You want me to open this, Andrew?

BY ATTORNEY PERRONG:

Q. Yes, please.

A. It's having me download it. Could you do a share screen? Does that work?

Q. Yeah, sure.

ATTORNEY HELFAND: Yeah. Ask me to download it as well. That's fine.

BY ATTORNEY PERRONG:

Q. Can you see the screen?

A. Yes.

Q. okay. So this is your response to Interrogatory Eight, where we ask for the third parties that provided you with the Plaintiff's number.

A. Okay.

Q. I just have a few points of clarification here. Here it states that you received phone numbers from Randall Reilly and Dun and Bradstreet,

28

but it sounds like your testimony today is that you only received the phone number from Dun and Bradstreet?

ATTORNEY HELFAND: Objection. Form.

THE WITNESS: Yeah, we --- we received Newell's business contact information from Dun and Bradstreet.

BY ATTORNEY PERRONG:

Q. Not from Randall Reilly?

A. Correct.

Q. And you see where it says here the company name?

A. Yes.

Q. The company name is simply Mr. Newell's name, isn't it?

A. That's his business name.

Q. So it's JR Capital's contention that Mr. Newell's business name is Jourey Newell?

A. Correct. Sole proprietorship.

Q. Where in here does it say that it's a sole proprietorship?

29

A. Well, Dun and Bradstreet provides business contact information. And if you look at SIC code 0782, that's a landscaping business, which is acknowledged by the IRS and the state.

Q. And there's two phone number --- there's two fields for the phone number listed here. Do you see that?

A. Yep.

Q. And it has the Plaintiff's phone number.

ATTORNEY HELFAND: Objection, form.

THE WITNESS: Well, his business phone number.

BY ATTORNEY PERRONG:

Q. Where does it say that this is his business number?

A. Well, all records from Dun and Bradstreet are businesses.

Q. What is lead source heavy metal mean?

A. That's just a lead source that

30

we identify Dun and Bradstreet as for our sales floor.

Q. So Dun and Bradstreet is heavy metal?

A. Correct.

Q. All right. I'm done with this. Once you obtain a telephone number, like the Plaintiffs from Dun and Bradstreet, walk me through the process of how that number is contacted.

ATTORNEY HELFAND: Objection, form.

THE WITNESS: Can you rephrase the question?

BY ATTORNEY PERRONG:

Q. Yes. Once you obtain the Pl --- a number like the Plaintiff's phone number from Dun and Bradstreet, how is it --- how is it that the telephone number ends up getting contacted by JR Capital?

A. Well, they're --- they're businesses and we're partnered with a

31

vendor, SlickText.

Q. Who loads the phone numbers into the SlickText system?

A. Me.

Q. And then do you dial those numbers en masse? Are they dialed one by one? How are they --- how are they contacted?

A. Texted ---.

ATTORNEY HELFAND: One second, Paris. So, objections. I think you're going beyond the scope there, Andrew.

BY ATTORNEY PERRONG:

Q. Once the number is contacted, is any sort of disposition entered, for example, that it's a business number or that a receptionist answered or something like that?

A. They're all businesses.

Q. I appreciate that, but my question is a little different. My question is, once the number is contacted, are any notes made in

32

SlickText or JR Capital's CRM system to indicate, for example, that it's a business number or that somebody spoke to a receptionist, something like that?

A. Yes, there's --- there's notes taken on feedback.

Q. Are there any notes that exist as to Mr. Newell's number?

A. Yes.

Q. What are those notes?

A. Well, his email to us.

Q. Why did you contact Mr. Newell after he emailed you and informed you that he was an individual and did not desire to receive these messages?

ATTORNEY HELFAND: Objection. Form.

THE WITNESS: I mean, it was a human error that we missed Newell's business contacting us. We do have a procedure in place that allows businesses to opt out of our --- of our text messages,

33

but unfortunately, a human error, we missed his email.

BY ATTORNEY PERRONG:

Q. What was the error that caused the email to be missed?

A. Just human error. We get a lot of emails. Unfortunately, it was missed.

Q. Do you recall from what email Mr. Newell sent the email to JR Capital from here?

A. What email he sent from?

Q. Yes.

A. I do not. Not offhand. We have a record of it. I don't --- I don't know off the top of my head.

Q. I'll bring it up for you.

ATTORNEY HELFAND: Are you going to mark this?

ATTORNEY PERRONG: As Exhibit 2.

ATTORNEY HELFAND: Great. Thank you.

---

34

(Whereupon, Exhibit 2, Email, was marked for identification.)

---

BY ATTORNEY PERRONG:

**Q. Bear with me. And I'll share my screen again. Do you recognize this document?**

A. Can you zoom in a little bit?

**Q. Sure.**

A. Yes, I recognize it.

**Q. How do you recognize this document?**

A. Well, it was the email that was sent to us from Newell's business. It was also --- I also reviewed this email prior to this meeting.

**Q. Do you contend that the email address, elom227@gmail.com, is a business?**

ATTORNEY HELFAND: Objection, form.

THE WITNESS: Can you scroll back down, please?

35

BY ATTORNEY PERRONG:

**Q. Yes.**

A. Oh, looks like it's from his personal name. What day was this? Can you go back up, please?

**Q. It's dated August 7th, 2023.**

A. I don't know. Wait, let me --- let me see that again. Looks like this is from his --- his business.

**Q. So it's JR Capital's contention that the address 671 Gulf Road and Mr. Newell's name in an email with no reference to Mr. Newell's business is from Mr. Newell's business?**

ATTORNEY HELFAND: Objection, form.

THE WITNESS: Wait. Rephrase the question.

BY ATTORNEY PERRONG:

**Q. Yeah. So where in this email does Mr. Newell reference his business?**

A. Well, the phone number. We reconciled the phone number in the

36

email to Newell's business in our CRM.

**Q. Can you please read the highlighted portion for me? Hold on. It's not highlighting for some reason.**

A. Well, I see the phone number. XXX-XXX ---.

**Q. Can you please just read the highlighted portion for me?**

A. Out loud?

**Q. Yes.**

A. Please provide me with a copy of your company's do not call policy. Please cease and desist all telemarketing calls to my mobile telephone, XXX-XXX-XXXX. I don't believe that I've ever provided my consent for your company to call my cellular telephone number, XXX-XXX-XXXX.

**Q. Does Mr. Newell say that this is his business telephone number?**

A. No.

**Q. He says it's a cell phone number. Right?**

37

A. That's what he says, yeah.

**Q. And JR Capital did nothing in response to this email? Right.**

ATTORNEY HELFAND: Objection. Form.

THE WITNESS: We missed his first email.

BY ATTORNEY PERRONG:

**Q. I'm done with that document. Before or at any point during which JR Capital was sending text message calls to the number, did it run any sort of line type identification to identify whether it was a wireless number or a landline number?**

ATTORNEY HELFAND: Objection. Form.

THE WITNESS: I mean, like I said, we got it from Dun and Bradstreet, which provides business contact information.

BY ATTORNEY PERRONG:

42

contend that Mr. Newell's telephone number is his business telephone number?

ATTORNEY HELFAND: Objection, form.

THE WITNESS: Say that again. Are we --- did you ask if we're pretending?

BY ATTORNEY PERRONG:

Q. No, I said contending.

A. Oh. Because, like I said, we --- Dun and Bradstreet provides business data for businesses throughout America. That's where we got his information. And also the fields stipulated in the --- in the database pertaining to Newell all point to the fact that he's --- he's a business, the SIC code, the industry.

Q. Does JR Capital have any evidence of how Newell actually used the number daily?

A. I mean, I don't have all the evidence. I have --- I have --- I see

43

what I --- what I've seen online that that phone number is pertained to Newell's contracting LLC registered with the US DOT and also with the Attorney General.

Q. And do you have any ---?

A. And also with Dun and Bradstreet.

Q. You contended Mr. Newell submitted his information to Dun and Bradstreet?

A. Can you rephrase that? When you say contend, do I ---?

Q. Yes. Does --- does Jet --- is JR Capital's position that Mr. Newell submitted his telephone number to Dun and Bradstreet?

A. I do not know where Dun Bradstreet gets its data.

Q. Does JR Capital have any evidence that Mr. Newell's number was registered with his telephone provider as a business?

ATTORNEY HELFAND: Objection, form.

44

THE WITNESS: Not that I know of. I mean, not that I know of.

BY ATTORNEY PERRONG:

Q. Does it have any evidence that a business paid for his phone bill?

ATTORNEY HELFAND: Objection. Form.

THE WITNESS: I don't believe you disclosed any phone bills to me, so I do not know the answer.

BY ATTORNEY PERRONG:

Q. Does it have any evidence that Mr. Newell himself held out the telephone number to the world as a business number?

ATTORNEY HELFAND: Objection, form.

THE WITNESS: I'm not sure what that means. I'm not sure what that means.

BY ATTORNEY PERRONG:

45

Q. What are you unsure of what means?

A. Can you rephrase the question?

Q. Yeah. Do you have any evidence that Mr. Newell held the phone number out to the world as a business telephone number?

A. Yes.

Q. What evidence?

A. It's on the US DOT federal database with his phone number on there. Also with the Attorney General, which I believe we sent in evidence of.

Q. Is it your position ---?

A. Also Dun and Bradstreet --- also the Dun and Bradstreet database.

Q. Is it your position that merely appearing in the DOT database makes a phone number --- a personal phone number a business phone number?

ATTORNEY HELFAND: Objection. Form.

THE WITNESS: If you're on the US DOT,

46

and it's --- especially the fact that it says LLC, yes. You are advertising yourself as a business in my personal opinion. But I'm not a lawyer.

BY ATTORNEY PERRONG:

Q. The Dun and Bradstreet information that you claim to have relied on doesn't use Mr. Newell's name as an LLC, does it?

A. As an LLC, no, at the time. Maybe it does now. At the time referencing 2022.

Q. Did JR search any records prior to contacting Mr. Newell's number to determine whether or not it was a residential number or business number?

ATTORNEY HELFAND:

Objection. Form.

THE WITNESS:

Again, it's Newell's business, what came from Dun and Bradstreet which is database of all businesses.

BY ATTORNEY PERRONG:

47

Q. Did anyone from Dun and Bradstreet make any representations to JR Capital that the numbers it was providing were business numbers?

A. I don't know what the word representation --- it sounds like a legal word, but in terms of how it was advertised and sold to us, it was sold to us as a database of businesses.

Q. Do you have writings showing how the Dun and Bradstreet data was sold to you?

A. We have a contract. Yes. I believe it's clearly states D&B Hoovers, which is known as their business database. B2B (phonetic).

Q. Did JR Capital ever go back to Dun and Bradstreet to dispute or verify its classification of Mr. Newell's number?

A. No.

ATTORNEY PERRONG:

Scott, I don't see the Dun and Bradstreet contract in any of the productions. Do you

48

think we could get a supplement as to that?

ATTORNEY HELFAND:

If they have it and we didn't produce it, we would be happy to do so. I thought it was in the supplemental production that I sent last week.

ATTORNEY PERRONG:

Yeah, I'm looking at the supplemental production and the only contract --- or the only invoices that I see are from the Randall Reilly people, not from Dun and Bradstreet, so ---.

ATTORNEY HELFAND:

Hold on one second.

THE WITNESS:

Scott, do you want me to help at all?

ATTORNEY HELFAND:

No, you're good. Hang on one second. I'm just

49

looking back to make sure. You know what, Andrew, I apologize. I left this off the production, so I'm going to send it just so you can use it right now. I'm going to email it to you and then I'll mark it --- it's going to be continental and I'll Bates label it. But let me just send it to you right now. All right?

ATTORNEY PERRONG:

Yep.

ATTORNEY HELFAND:

And Andrew, if you want to take a break, take a look at it to make sure you have all the --- you know, you can ask all the questions you want. I apologize for leaving that off.

ATTORNEY PERRONG:

No, it's fine.

ATTORNEY HELFAND:

And while you're looking

13 (Pages 46 to 49)

50

at it --- and you're welcome to take a break or whatever you want to do, but while you're looking at it, I'm going to have my assistant Bates label that for you.

ATTORNEY PERRONG:

Yeah, we'll --- I'll just take a --- take a five-minute break and review that and make it an exhibit and then take it from there.

ATTORNEY HELFAND:

Thank you.

---

(WHEREUPON, A SHORT BREAK WAS TAKEN.)

---

BY ATTORNEY PERRONG:

**Q. Did you communicate with anybody during our break?**

A. I had to respond to a text message, yes.

**Q. With whom did you correspond during your break?**

A. Just a --- just a vendor

51

partner regarding a --- like financing a piece of equipment.

**Q. All right. I have an exhibit that I'm going to mark as Exhibit 3.**

A. Okay.

---

(Whereupon, Exhibit 3, Order Form, was marked for identification.)

---

BY ATTORNEY PERRONG:

**Q. So do you recognize this document?**

A. Yes.

**Q. How do you recognize the document?**

A. I'm the one that produced this contract for you guys. I posted my records.

**Q. This was a contract that you signed?**

A. Yeah. Can you scroll the bottom? I believe my signature's on here.

52

Right? Yeah, that's me.

**Q. Can you explain why it says name is Paris Robbins, but under the signature, it appears to be Mr. Wasser's signature?**

A. I should have told you just go to the bottom. Well, I can sign on behalf of the company.

**Q. Where in this document, including terms and conditions, does it state that Dun and Bradstreet is providing you business telephone numbers?**

A. Scroll to the top.

**Q. Yep.**

A. Include 5,000 company, number of company, plus contact bundle. Go down. And then also D&B Hoover's, the service name. Everyone knows D&B Hoovers is a credit reporting database for all businesses. There you go. D&B Hoovers.

**Q. And can you explain to me this hard bounce contact replacement guarantee? It discusses undeliverable**

53

**email addresses. Did Dun and Bradstreet also provide you email addresses?**

A. I don't recall.

ATTORNEY PERRONG:

All right. That's all the questions that I had for that document.

ATTORNEY HELFAND:

Andrew, just real quick, just to let you know, I'm sending you the Bates labeled copy right now.

ATTORNEY PERRONG:

Thank you. I think we might want to discuss a potential for a subpoena to Dun and Bradstreet given this disclosure. But I think we can --- we can discuss that after the deposition.

ATTORNEY HELFAND:

Sure.

BY ATTORNEY PERRONG:

**Q. Does JR Capital have any**